# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TERESA L. SCERCY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:10CV296 |
| | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Teresa L. Scercy, brought this action pursuant to Section 205(g) of the Social

Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain review of a final decision

of the Commissioner of Social Security denying her claims for a Period of Disability ("POD")

and Disability Insurance Benefits ("DIB") under Title II of the Act.[1]  The Court has before it

the certified administrative record and cross-motions for judgment.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff filed an application for a POD, DIB, and Supplemental Security Income benefits ("SSI") on March 20, 2006 (protective filing date March 14, 2006), alleging a disability onset date of March 5, 2006.[2] (Tr. 14, 136-40, 141-44.)[3] The application was denied initially and upon reconsideration. (*Id.* at 69-77, 79-87.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 88.) Present at the August 13, 2008 hearing were Plaintiff, her attorney, and a vocational expert ("VE"). (*Id.* at 22-58.) The ALJ determined that Plaintiff was not disabled under the Act. (*Id.* at 11-21.) On February 23, 2010 the Appeals Council denied Plaintiff's request for review, making the ALJ's determination the Commissioner's final decision for purposes of review. (*Id.* at 1-5.)

# II. FACTUAL BACKGROUND

Plaintiff was forty-four years old on the alleged disability onset date. (*Id.* at 19.) She attended school through eleventh grade (*id.* at 201), obtained a GED (*id.* at 29), and her past relevant work was primarily as a cashier, bartender, and as a sewing machine operator (*id.* at 165-66, 194-96).

# III. STANDARD FOR REVIEW

The Commissioner held that Plaintiff was not under a disability within the meaning of the Act. Under 42 U.S.C. § 405(g), the scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). This Court's review of that decision is limited to determining whether there is substantial evidence

---

[2] Although Plaintiff applied for SSI benefits, she was determined ineligible because of income and living arrangement. (Tr. 63-68.) Plaintiff does not challenge this determination.

[3] Transcript citations refer to the administrative record.

in the record to support the Commissioner's decision.   42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hunter*, 993 F.2d at 34 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).   It "consists of more than a mere scintilla" "but may be somewhat less than a preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

The Commissioner must make findings of fact and resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456 (citing *King v. Califano*, 599 F.2d 497, 599 (4th Cir. 1979)).   The Court does not conduct a de novo review of the evidence nor of the Commissioner's findings. *Schweiker*, 795 F.2d at 345.   In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, to make credibility determinations, or to substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Hays*, 907 F.2d at 1456).   "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).   The denial of benefits will be reversed only if no reasonable mind could accept the record as adequate to support the determination. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).   The issue before the Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.   *See id.*; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

3

## IV. THE ALJ'S DISCUSSION

The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment[4] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 423(d)(1)(a). To meet this definition, a claimant must have a severe impairment which makes it impossible to do previous work or any other substantial gainful activity[5] that exists in the national economy. 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 423(d)(2)(A).

### A. The Five-Step Sequential Analysis

The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled, which is set forth in 20 C.F.R. § 404.1520. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). The ALJ must determine in sequence:

(1)     Whether the claimant is engaged in substantial gainful activity (*i.e.*, whether the claimant is working). If so, the claimant is not disabled and the inquiry ends.

(2)     Whether the claimant has a severe impairment. If not, then the claimant is not disabled and the inquiry ends.

---

[4] A "physical or mental impairment" is an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3).
[5] "Substantial gainful activity" is work that (1) involves performing significant or productive physical or mental duties, and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510.

4

(3)     Whether the impairment meets or equals to medical criteria of 20 C.F.R., Part 404, Subpart P, Appendix 1, which sets forth a list of impairments that warrant a finding of disability without considering vocational criteria. If so, the claimant *is* disabled and the inquiry is halted.

(4)     Whether the impairment prevents the claimant from performing past relevant work. If not, the claimant is not disabled and the inquiry is halted.

(5)     Whether the claimant is able to perform any other work considering both her residual functional capacity[6] and her vocational abilities. If so, the claimant is not disabled.

20 C.F.R. § 404.1520.

Here, the ALJ reached the fifth step of the sequence, at which point he determined that Plaintiff was not disabled as of the date of his decision. The ALJ first determined that Plaintiff had not engaged in substantial gainful activity at any time since her alleged onset date of March 5, 2006. (Tr. 16.) The ALJ next found in step two that Plaintiff had severe impairments: shoulder bursitis and bilateral hammertoe deformities. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1. (*Id.* at 17.)

---

[6]  "Residual functional capacity" is the most a claimant can do in a work setting despite the physical and mental limitations of his impairment and any related symptom (*e.g.*, pain). *See* 20 C.F.R. § 404.1545 (a)(1); *see also Hines v Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory or skin impairments)." *Hall v. Harris*, 658 F.2d 260, 265 (4th Cir. 1981).

5

## B. Residual Functional Capacity Determination

Prior to steps four and five, the ALJ determined Plaintiff's RFC based on the ALJ's evaluation of the evidence, including Plaintiff's testimony and the findings of treating and examining health care providers. (Tr. 16-19.) Based on the evidence as a whole, the ALJ determined that Plaintiff retained the RFC to lift and carry ten pounds occasionally, stand or walk for two hours per eight-hour workday, and sit for six hours per workday. (*Id.* at 17.) The ALJ also concluded that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, crawl and reach overhead with her dominant hand, and could frequently, but not constantly, perform handling and fingering bilaterally. (*Id.*) The ALJ also determined that claimant only has mild problems with attention, concentration, understanding, and memory. (*Id.*) In reaching a conclusion about Plaintiff's RFC, the ALJ considered Plaintiff's testimony and found that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional assessment . . . ." (*Id.* at 18.)

## C. Past Relevant Work

The ALJ found in step four that Plaintiff was not capable of performing the functional demands of her past relevant work as a sewing machine fixer, bartender, and cashier. (*Id.*) The ALJ concluded that these positions were skilled and semi-skilled in nature, and "performed at the medium and light exertional levels" exceeding the work Plaintiff was now limited to performing. (*Id.*)

6

### D. Adjustment to Other Work

The claimant bears the initial burden of proving the existence of a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512; *Smith v. Califano*, 592 F.2d 1235, 1236 (4th Cir. 1979). Once the claimant has established at step four that she cannot do any work she has done in the past because of her severe impairments, the burden shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy which the claimant could perform consistent with her RFC, age, education and past work experience. *Hunter*, 993 F.2d at 35; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

The ALJ found that Plaintiff was 44 years old on her alleged disability onset date which is defined as a "younger individual age 18-44," with at least a high school education and the ability to communicate in English. (Tr. 19.) The ALJ noted that transferability of job skills was not at issue pursuant to the table rules set forth in the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2. (*Id.*) The ALJ found that based on Plaintiff's age education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform and that Plaintiff was not disabled from March 5, 2006, the alleged onset date, through the date of decision. (*Id.* at 20.)

### V.  ANALYSIS

Plaintiff raises four issues. First, Plaintiff contends that the ALJ erred in evaluating her mental condition. (Docket Entry 7 at 3.) Second, Plaintiff argues that the ALJ erred by ignoring the records and opinions of Dr. John Tuttle, Plaintiff's primary care physician. (*Id.* at 3-4.) Third, Plaintiff contends the ALJ erred in concluding that she could perform a

7

significant number of sedentary jobs in the national economy.  (*Id.* at 4.)  Fourth, Plaintiff

asserts that this matter should be remanded for consideration of new evidence.  (*Id.*)

## A.  The ALJ Did Not Err in Assessing Plaintiff's Mental Condition.

Plaintiff asserts that the ALJ erred in assessing her mental health.  (Docket Entry 7 at

4-9.)  The law in this area is well-established and the five-step sequential evaluation process

applies to the evaluation of both physical and mental impairments.  20 C.F.R. § 404 .1520a(a).

Moreover, when evaluating the severity of mental impairments, the Social Security

Administration implements a "special technique," outlined at 20 C.F.R. § 404.1520a.  *Id.*

In the first stage of this technique, symptoms, signs, and laboratory findings are

evaluated to determine whether a claimant has a medically determinable mental impairment.

*Id.* § 404.1520a(b)(1).[7]  Second, if the ALJ determines that an impairment(s) exists, the ALJ

must specify the symptoms, signs, and laboratory findings that substantiate the presence of the

impairment(s).  *Id.* § 404.1520a(b)(1) and (e).  Third, the ALJ then must rate the degree of

functional limitation resulting from the impairment(s).  *Id.* § 404.1520a(b)(2).[8]

---

[7] "[S]ymptoms" consist of a claimant's description of her alleged impairment.  20 C.F.R. § 404.1528(a).  In contrast, "signs" include "psychological abnormalities which can be observed."  20 C.F.R. § 404.1528(a)-(b).  In addition, "[p]sychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.,* abnormalities of behavior, mood, thought, memory, orientation, development, or perception."  *Id.* § 404.1528(a)-(b).  "Laboratory findings" include "psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques."  *Id.*

[8] Functional limitation is rated with respect to four broad areas (activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation).  20 C.F.R. § 404. 1520a(c)(3).  The first three areas are rated on a five-point scale:  None, mild, moderate, marked, and extreme.  The fourth area is rated on a four-point scale:  None, one or two, three, four or more.  *Id.* § 404.1520a(c)(4).  A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise.  *Id.* § 404.1520a(d)(1).  An impairment or combination of impairments

8

Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a listed mental disorder. *Id.* § 404.1520a(d)(2). Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity. *Id.* § 404.1520a(d)(3). The ALJ then incorporates the findings derived from the analysis in his decision. *Id.* § 404.1520a(e)(4).

Here, the ALJ evaluated the first four steps set forth above, stopping at step four upon concluding that Plaintiff did not establish that she had a severe mental health impairment. (Tr. 17-18.) The ALJ expressly indicated that he carefully considered the entire record. (*Id.* at 14, 16.) The ALJ also expressly addressed the medical opinions relevant to mental health and evaluated Plaintiff's allegations of mental health impairments under the four functional areas for evaluating mental disorders. (*Id.* at 16-17.) The ALJ acknowledged and summarized Plaintiff's relevant testimony at the hearing. (*Id.* at 16.) The ALJ then addressed the objective mental health evidence by discussing at length the medical opinion of Dr. DeHaas, the state disability examiner who examined Plaintiff on April 24, 2006. (*Id.* at 17, 423.) In discussing the medical opinion of Dr. DeHaas, the ALJ also pointed to and briefly discussed the medical opinion of non-examining medical consultant Dr. Frances Breslin in the form of a Mental Residual Functional Capacity Assessment ("MRFCA"). (*Id.* at 17, 431.) The ALJ partially accepted and partially discounted the medical opinions of Dr. DeHaas and Dr.

---

is not severe if it does not "significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). "Basic work activities" are the abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, lifting, *etc.* 20 C.F.R. §§ 404.1521(b). The Commissioner has explained that "an impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." Social Security Ruling 96–3p, *Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment Is Severe.*

9

Breslin, concluding that he was "unable to fully accept these opinions as they are inconsistent with the claimant's lack of mental health complaints, her own reports of her daily activities and abilities, and Dr. DeHaas' objective findings on exam." (*Id.* at 17.) The ALJ concluded:

> [B]ased on the lack of objective mental health evidence, the undersigned finds . . . no more than mild limitations with activities of daily living, mild limitations with social functioning, mild limitations with concentration, persistence or pace and no episodes of decompensation. Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, it is nonsevere. (20 CFR 416.920a(d)(1)).

(Tr. 17.) In light of the ALJ's assessment, the undersigned concludes that the ALJ's decision reflects appropriate use of the "special technique" to evaluate Plaintiff's mental impairments and that the ALJ's decision that Plaintiff does not suffer from a severe impairment is legally correct and supported by substantial evidence.

Nevertheless, Plaintiff contends that the ALJ erred by "ignoring the conclusions" of Dr. Tuttle, Plaintiff's treating physician, as well as Dr. DeHaas and Dr. Breslin, and consequently erred further by failing to conclude that she has a severe mental impairment. (Docket Entry 7 at 4-9.) The Court will consider these allegations in turn.

### Dr. Tuttle

Dr. Tuttle was Plaintiff's primary care physician since at least 1991. (*Id.* at 4; Tr. 484-526.) The "treating physician rule,"[9] 20 C.F.R. § 404.1527(d)(2), generally requires an

---

[9] Effective March 26, 2012, a regulatory change renumbered, but did not impact the substantive language of, the treating physician rule. 77 Fed. Reg. 10651-10657 (Feb. 23, 2012). Given that all material events in this action precede this nominal regulatory change, this Opinion and

10

ALJ to give more weight to the opinion of a treating source, because it may:

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).[10] However, not all treating sources are created equal. Thus, an ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. *Id.* § 404.1527(d)(2)-(6). These factors include: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id.*

Significantly, as subsections (2) through (4) of the rule describe in great detail, a treating source's opinion, like all medical opinions, must be both well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. *Id.* §

---

Recommendation will make use of the pre-March 26, 2012 citations.

[10] Social Security Ruling 96–2p provides that "Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Social Security Ruling 96-2p, *Titles II and XVI: Giving Controlling Weight to Treating Sources Medical Opinions.* However, where "a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight." *Id.* Social Security Ruling 96-5p provides further that "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." Social Security Ruling 96-5p, *Medical Source Opinions on Issues Reserved to the Commissioner.* However, "opinions from any medical source about issues reserved to the Commissioner must never be ignored, and . . . the notice of the determination or decision must explain the consideration given to the treating source's opinion(s)." *Id.*

11

404.1527(d)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590; *accord Mastro*, 270 F.3d 171, 178 (4th Cir. 2001). Moreover, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Act never receive controlling weight because the decision on that issue remains for the Commissioner alone. 20 C.F.R. § 404.1527(e).

Plaintiff points to two places she contends demonstrate a severe mental health impairment. (Docket Entry 7 at 8-9.) The first is a line from Dr. Tuttle's treatment notes, dated November 22, 2006, stating "Long [history] depression-married x 20 year[s] and abused physically over & over-divorced x 6 years ......... 2o [secondary] Depression to years of abuse & although remarried, some effects of post traumatic stress disorder." (Tr. 491.) The second is the Physical Residual Functional Capacity Questionnaire ("PRFCQ") partially filled out by Dr. Tuttle, also dated November 22, 2006, stating "Chronic anxiety and depression/ post-traumatic stress dx make any work in competitive environment impossible." (*Id.* at 488.)

Plaintiff is correct that the ALJ did not expressly address this particular evidence in his decision. However, an ALJ need not provide a written evaluation for each document in the record. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995); *N.L.R.B. v. Beverly Enterprises-Massachusetts*, 174 F.3d 13, 26 (1st Cir. 1999). While the ALJ did not specifically address the abovementioned evidence, he repeatedly stated that he considered all the evidence of record. (Tr. 14, 16.) Moreover, the ALJ was aware of Dr. Tuttle's treatment notes, and discounted them as conclusory in nature and unsupported by objective evidence, albeit

12

without expressly referencing Plaintiff's mental state. (*Id.* at 18.) ("[T]he medical records from Tuttle reveal very little objective information, apart from recitations of claimant's subjective complaints.") Plaintiff acknowledges Dr. Tuttle's treatment notes lack detail in her brief. (Docket Entry 7 at 9.) ("Although admittedly, Dr. Tuttle's notes do not have a great deal of detail, they do record repeated subjective complaints of shoulder, neck and knee pain and subjective complaints of depression and anxiety from 1991 until 2008.") As for this particular treatment note, apart from being conclusory, it could at best show some support for the mere presence of mental impairments; but not that these impairments could reasonably be designated as severe.

Likewise, the ALJ was aware of the abovementioned PRFCQ partially completed by Dr. Tuttle because he references it in his decision, albeit without mentioning Dr. Tuttle by name. (Tr. 19.) ("[T]here are sections of the opinion marked as though they were filled out by another individual which are also unsupported by objective evidence.") As explained, the ultimate issue of whether Plaintiff is disabled or unable to work is administrative and thus reserved for the Commissioner. Dr. Tuttle's conclusory statement in the PRFCQ that Plaintiff was unable to work in a "competitive environment" addressed an issue reserved for the Commission. *See also Cain-Wesa v. Astrue*, No. 11–C–1063, 2012 WL 2160443, *15 (E.D. Wis. June 13, 2012) (unpublished) ("[T]he ALJ need not give special consideration to a bald statement that the claimant is 'disabled' or 'unable to function in a competitive work environment.'"). Accordingly, the ALJ did not err in discounting Dr. Tuttle's conclusion.

13

Beyond this, the undersigned has reviewed Dr. Tuttle's treatment notes, which intermittently span 1991 to 2008. (Tr. 490-511.) They contain a few references related to Plaintiff's mental health.[11] At most, these scattered references indicate some treatment for depression, anxiety, and/or post-traumatic stress. However, these few notes (and attendant prescriptions for Paxil, Xanax, and Celexa) over a nearly twenty year period shed no meaningful light regarding the severity of these ailments, and most of the notes significantly pre-dated Plaintiff's alleged onset date of disability in March 2006. Consequently, any failure on the part of the ALJ to abide by the letter of the treating physician rule and expressly discuss Dr. Tuttle's opinion of Plaintiff's mental health in detail amounted to at most harmless error. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of the perfect opinion unless there is reason to believe that remand might lead to a different result.").

### Dr. DeHaas

Dr. DeHaas' report included a diagnostic impression of Plaintiff of "Major Depressive Disorder, recurrent, current-episode moderate severity" and a Global Assessment of Functioning ("GAF") Score of 54.[12] (Tr. 427.) DeHaas' "summary and conclusions" stated:

---

[11] There appear to be only a few treatment notes that could bear on Plaintiff's mental health issues over a roughly twenty year period, none of which shed meaningful light on their severity. (*See, e.g.*, Tr. 509 (10/25/97) (notations stating "moody," "nervous," "crying," "irrational anger," "high strung + depressed," "No meds X 3 weeks"); Tr. 492 (7/18/06) ("Feels tired a lot."); Tr. 494 (3/9/92) ("Headaches" and "PMS nervous headache"); 3/23/92 ("crying spell"); Tr. 500 ("nerves stress @ work")).

[12] The GAF is a scale ranging from zero to one hundred used to rate an individual's psychological, social, and occupational functioning. *See* Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th Ed., Text Revision 2000). Scores between 51-60 indicate moderate symptoms or moderate difficulties in social, occupational, or school functioning. *Id.*

14

[Plaintiff] was interviewed and evaluated for mental status functioning. She reported symptoms consistent with major depressive disorder recurrent, current episode moderate severity and inability to manage some basic responsibilities for independent living without assistance including aspect of grocery shopping and housework, as well as cooking on a regular and consistent basis without assistance. Given her current level of functioning, it does appear that she is able to understand, retain and follow instructions. Based on her current level of functioning, it appears that she could perform simple, repetitive, and routine tasks but could have difficulty in maintaining concentration, persistence and pace on a regular daily basis based on her reported problems with concentration and memory. Based on her current functioning, it does not appear that her current depression level should prevent her from being able to interact with peers and respond appropriately to supervision. Based on her current functioning, it appears that her current depression level could negatively affect her ability to tolerate the stress and pressures associated with day-to-day work activities.

(*Id.*) The ALJ did not accept these conclusions in full, because they were inconsistent with Plaintiff's lack of mental health complaints, her reports of daily activities and abilities, and Dr. DeHaas' objective findings. (*Id.* at 17.) Substantial evidence supports this conclusion.

First, the ALJ did not err in concluding that the record failed to demonstrate a history of mental health complaints that weigh towards characterizing Plaintiff's mental health limitations as severe. As noted, the only longitudinal study (*i.e.*, Dr. Tuttle's notes) was conclusory and did not provide meaningful evidence of the severity of Plaintiff's impairments.

Plaintiff's self-reporting also provided substantial evidence indicating her mental health impairments were not severe. Plaintiff testified before the ALJ to performing a range of activities of daily living, stating that she could (1) perform "[a] little housework," (2) take out "a little dog," (3) clean, (4) "sit and read, watch TV, listen to the radio," (5) drive, (6) "visit with

15

family or friends," and (7) "go to church." (*Id.* at 31.) Plaintiff stated that she did not cook (*id.*) but later noted that it was because her "husband cooks better." (*Id.* at 49.) She further testified that she goes to the store by herself and does her own laundry. (*Id.* at 51.)

Likewise, Plaintiff also reported to Dr. DeHaas that she could perform a range of activities of daily living, including (1) doing "a few dishes," (2) watching soap operas, (3) bathing, (4) playing with her dogs, (5) doing "her own self-care," (6) driving, (7) managing her finances, and (8) taking medication on her own. (*Id.* at 425-26.) However, Plaintiff reported that she "does not socialize or go out in public much due to not having finances and also due to her liking being at home" and that "she does not socialize even on the phone due to 'never having had a lot of friends.'" (*Id.* at 425.) Plaintiff reported that "her husband does most of the cooking, that she lets her husband mainly do the grocery shopping because she does not feel comfortable doing it and physically finds it difficult" and that "she can do some housework but that she 'pays for it.'" (*Id.* at 426.) Plaintiff reported too that "she mops approximately once a week but cannot scrub the shower or do other more difficult physical work around the home." (*Id.*) She reported her daily mood as "depressed" and "irritable" and noted that she had difficulty concentrating at times because "sometimes her 'mind' goes off on his own and 'wanders.'" (*Id.*) She noted that "she sometimes forgets to take her medication or give the dogs water, and that she needs to make an extra effort to remember things.'" (*Id.*)

Last, Dr. DeHaas' own objective findings provide support for the ALJ's conclusion that Plaintiff's mental health impairments were not severe. Dr. DeHaas observed Plaintiff

16

was: (1) "dressed neatly and casually," (2) "verbal, cooperative and considered to be a reliable historian," (3) without "abnormalities in posture, gait or movements," (4) in possession of "good contact with reality," (5) displaying "motor activity . . . within normal limits," (6) evincing intact impulse control, (7) "neither minimizing nor exaggerating her symptoms of psychiatric distress," (8) "fully alert, appropriately responsive and seemed motivated for the evaluation," (9) sober, (10) displaying speech "appropriate in tone, flow, and volume," (11) without psychomotor agitation, hyperactivity, psychomotor slowing, or retardation, (12) displaying a moderately depressed affect within the reactive and full range, (13) displaying an emotional expression appropriate to content and situation, (14) displaying clear, coherent, logical, and goal directed thought, without flight or "paucity of ideas, lose associations, evasiveness or other thought disturbance," (15) without preoccupation, suicidal or homicidal ideation, delusion, hallucination, persecutory ideation or disturbance in concept formation. (*Id.* at 423-26.)

Dr. DeHaas also observed that Plaintiff was: (1) fully oriented to person, place, date, time, and situation, (2) able to describe what she had for her meals and what she did the day before the exam, (3) able to provide personal dates (though she could not remember the anniversary of her current marriage), (4) able to name two large cities, (5) able to describe certain current events, (6) able to name the President, (7) able to repeat five of five common words, (8) able to repeat six digits forward and thee digits backward, (9) unable to perform serial 7's, but could perform serial 3's, (10) able to perform two digit addition and subtraction, (11) able to remember five words out of five after five minutes, (12) able to interpret common

17

figures of speech, and (13) able to indicate how she would respond to various hypothetical scenarios. (*Id.* at 426-27.) In sum, it was not error for the ALJ to partially discount Dr. DeHaas' conclusions as being inconsistent with Plaintiff's lack of mental health complaints, her own reports of her daily activities and abilities, and DeHaas' objective findings on exam.

Plaintiff asserts that the ALJ "reject[ed] . . . [Dr. DeHaas'] report because it is based on subjective evidence." (Docket Entry 7 at 7.) In support, Plaintiff points to places in Dr. DeHaas' evaluation where she self-reported (1) "[r]eally bad mood swings," (2) loss of interest, (3) a preponderance of "low and sad mood days," (4) difficulty in focusing and concentrating, (5) irritability, (6) lack of energy and lack of care, (7) "cr[ying] all the time," (8) back pain, foot pain, and throat pain, and (9) isolation from friends and family members. (*Id.*) However, the ALJ never refused to consider evidence of subject complaints memorialized in Dr. DeHaas' report and the ALJ's rationale for discounting some of DeHaas' conclusions, evaluated at length above, does not support Plaintiff's contention.

By way of further example, the record does not support Plaintiff's contention that she cries all the time or suffers from severe chronic mood disturbance. (*Id.* at 424.) Dr. Tuttle's intermittent treatment notes do not support this notion, as they record few instances of crying or severe mood disturbance over almost two decades, nor does Dr. DeHaas' report indicate that Plaintiff was crying or displaying anything other than an appropriate emotional expression upon examination. Likewise, Dr. DeHaas noted Plaintiff reported an inability to manage some basic responsibilities for independent living without assistance, including cooking. However, at the hearing before the ALJ, Plaintiff indicated that the reason her husband

18

cooked for her was "[b]ecause [her] husband cooks better." (*Id.* at 49.) Also, Plaintiff testified at the hearing that she talks to her father "almost every day," talks to her "daughter every day," and talks to her son "once a week." (*Id.* at 51.) Additionally, Plaintiff testified that she attends church weekly and receives guests on the weekend. (*Id.* at 51-52.) Yet, Plaintiff stated to Dr. DeHaas that she does not socialize much. (*Id.* at 425.) In short, the ALJ did not partially discount Dr. DeHaas' conclusions simply because they relied on Plaintiff's self-reporting and the ALJ's evaluation of Dr. DeHaas' opinion is supported by substantial evidence.

### Dr. Breslin

Dr. Breslin, a non-examining medical consultant prepared a MRFCA and Psychiatric Review Technique as to Plaintiff. (*Id.* at 431-448.) The former provided that Plaintiff was "Not Significantly Limited" in fourteen of twenty listed categories, and provided further that Plaintiff was "Moderately Limited" in the remaining six categories: (1) "The ability to understand and remember detailed instructions," (2) "The ability to carry out detailed instructions," (3) "The ability to maintain attention and concentration for extended periods," (4) "The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," (5) "The ability to interact appropriately with the general public," and (6) "The ability to respond appropriately to changes in the work setting." (*Id.* at 430-32.) Dr. Breslin's MRFCA next noted that:

> A. Claimant is able to understand and remember simple three-step directions.

19

B. Claimant has some deficits in sustained concentration, but claimant is able to sustain attention to complete simple routine tasks for a 2 hour period at a non-production pace.

C. Claimant can accept direction for a supervisor and maintain adequate relationships with co-workers in work settings with no demand for extensive social interaction.

D. Claimant will have some difficulty adapting to change, but will be able to function with a stable work assignment.

(*Id.* at 433.)   Dr. Breslin then concluded that Plaintiff was able to perform routine repetitive tasks.   (*Id.*)   As for Dr. Breslin's PRT, it provided that Plaintiff had mild limitations in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.   (*Id.* at 445.)   Although the ALJ did not cite Dr. Breslin by name, the ALJ did cite Dr. Breslin's MRFCA and noted that "a Disability Determination Services' physician found the claimant capable of performing only routine, repetitive tasks."   (*Id.* at 17.)

For the same reasons the ALJ discounted some of the conclusions of Dr. DeHaas, the ALJ also partially discounted the conclusions of Dr. Breslin.   The ALJ found that Plaintiff exhibited at most mild limitations in activities of daily living, mild limitations in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.   (*Id.* at 17.)   To the extent Dr. Breslin concluded otherwise, the ALJ determined that her conclusions were inconsistent with Plaintiff's lack of mental health complaints, her reports of her daily activities and abilities, and Dr. DeHaas' objective findings.

Plaintiff contends that the ALJ erred by accepting Dr. Breslin's conclusion that Plaintiff could perform routine, repetitive tasks, while discounting Dr. Breslin's additional conclusions (particularly Conclusion B set forth above) regarding Plaintiff's mental impairments. (Docket Entry 7 at 7-8.) However, for the same reasons the ALJ did not err in partially discounting the conclusions of Dr. Dehaas, discussed above, the ALJ did not err in partially discounting the conclusions of Dr. Breslin.[13] Substantial evidence supports the ALJ's decision that the conclusions of both doctors were inconsistent with Plaintiff's lack of mental health complaints, her reports of her daily activities and abilities, and Dr. DeHaas' objective findings.

## B.  The ALJ Did Not Err in Evaluating Dr. Tuttle's Medical Opinion.

Plaintiff next argues that the ALJ erred by ignoring the records and opinions of Dr. Tuttle. (Docket Entry 7 at 9-11.) Specifically, citing *Craig v. Chater*, Plaintiff contends that the ALJ improperly discredited Plaintiff's allegations of pain. 76 F.3d 585 (4th Cir. 1996). In support, Plaintiff again points to the treatment notes of Dr. Tuttle and the PRFCQ jointly completed by Dr. Tuttle and Dr. Diehl, Plaintiff's podiatrist.[14] Plaintiff also argues that the

---

[13] As explained above, substantial evidence supports the ALJ's decision to partially discount Dr. Breslin's opinion. Beyond that, however, the undersigned notes that the Social Security Administration's *Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work* provides that sedentary jobs customarily have "a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." SSR 96-9p. Thus, the sedentary jobs that the VE testified Plaintiff remained capable of performing were generally consistent with Dr. Breslin's opinion that Plaintiff could sustain attention for a two hour period.

[14] Also, citing *Rohan v. Chater*, Plaintiff contends that the ALJ used his own lay view of depression in the place of Dr. Tuttle and therefore committed prejudicial error. 98 F.3d 966 (7th Cir. 1996). Plaintiff essentially argues anew that the ALJ erred in discounting Dr. Tuttle's evaluation of Plaintiff's mental health impairments. The undersigned has addressed this issue at length above and will not address it again here except to point out that this case is factually inapposite to *Rohan*. In *Rohan*, the ALJ improperly disregarded the treating physician's opinion and substituted his own judgment when

ALJ erred in rejecting Dr. Tuttle's assessment in the PRFCQ that Plaintiff was (1) limited to lifting less than ten pounds occasionally, (2) had limited use of her hands, fingers, and arms,[15] and (3) that Plaintiff was unable to perform repetitive movements or any lifting due to her chronic bursitis, cervical disc degeneration, and left arm numbness. (Tr. 485, 487, 488.)

The Fourth Circuit Court of Appeals has adopted a two-step process by which the ALJ must evaluate a claimant's symptoms. The first step requires the ALJ to determine if the plaintiff's medically documented impairments could reasonably be expected to cause plaintiff's alleged symptoms. *Craig*, 76 F.3d at 594. The second step includes an evaluation of subjective evidence, considering claimant's "statements about the intensity, persistence, and limiting effects of [claimant's] symptoms." *Id.* at 595 (citing 20 C.F.R. §§ 416.929(c)(4) and 404.1529(c)(4).) "The ALJ must consider the following: (1) a claimant's testimony and other statements concerning pain or other subjective complaints; (2) claimant's medical history and laboratory findings; (3) any objective medical evidence of pain; and (4) any other evidence relevant to the severity of the impairment." *Grubby v. Astrue*, No. 1:09CV364, 2010 WL 5553677, at *3 (W.D.N.C. Nov. 18, 2010) (unpublished) (citing *Craig*, 76 F.3d at 595; 20 C.F.R. § 404.1529(c)).) "Other evidence" refers to factors such as claimant's daily activities, duration and frequency of pain, treatment other than medication received for relief of symptoms, and any other measures used to relieve claimant's alleged pain. *Id.*

---

he determined that the plaintiff's efforts to establish a small repair business were incompatible with a diagnosis of major depression. *Id.* at 970-71. Similar facts are absent here and, as noted, Dr. Tuttle's treatment notes and conclusions in the PRFCQ are conclusory in nature.

[15] Dr. Tuttle opined that Plaintiff could only (1) use her right hand 50% of the workday, her right fingers 20% of the workday, and her right arm 10% of the workday, and (2) could only use her left hand 10% of the day and her left fingers and arm 10% of the workday. (Tr. 487.)

Here, substantial evidence supports the ALJ's assessment of Plaintiff's credibility, including allegations of pain. The ALJ concluded that, upon considering the evidence, Plaintiff's impairments "could reasonably be expected to produce the alleged symptoms." (Tr. 18.) Thus, the ALJ performed the first step of the *Craig* analysis. Next, the ALJ performed step two of the analysis, concluding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (*Id.*) In support of this conclusion, the ALJ was correct to point out that Dr. Tuttle's medical records "reveal very little objective information, apart from recitations of the claimant's subjective complaints" and was also correct in concluding that Dr. Tuttle's contribution to the PRFCQ is "unsupported by any objective medical evidence." (*Id.* at 18-19.)[16]

The ALJ also correctly pointed out that Dr. Kola Adekanmbi, a disability examiner, noted upon examination that Plaintiff had a normal gait and an ability to sit, stand, and move around without much difficulty. (*Id.* at 456.) Plaintiff could stand on her heels and toes, squat, and tandem walk. (*Id.*) She had no cervical or lumbar tenderness and straight leg raising was negative bilaterally. (*Id.*) While her range of motion was reduced, she had no demonstrable effusion or muscle atrophy. (*Id.*) Plaintiff "was able to raise her arms over her shoulder without any difficulty" and "[h]er grip strength [was] strong and symmetrical." (*Id.*)

---

[16] The ALJ's opinion states that "there are sections of the opinion marked as though they were filled out by another individual which are also unsupported by any objective evidence." (Tr. 19.) It is relatively clear that both Dr. Tuttle and Dr. Diehl filled out this document together, however, to the extent the ALJ did not realize this, the error is harmless, given that the ALJ correctly concluded that the notations in question were "unsupported by any objective evidence."

23

X-rays of Plaintiff's left knee were normal apart from mild degenerative changes and lumbosacral X-rays were also completely normal except for straightening of lordosis. (*Id.* at 452.) The ALJ also correctly pointed out that Plaintiff testified that she was able to perform some housework, walk her dog, drive, and attend church. (*Id.* at 31.)

The ALJ also considered Dr. Diehl's medical opinion, noting that Dr. Diehl opined that Plaintiff's foot pain had improved with treatment and that she could walk more normally. (*Id.* at 482.) Dr. Diehl opined elsewhere that Plaintiff could stand or walk for less than two hours per workday and occasionally lift less than ten pounds, among other limitations. (*Id.* at 486-87.) The ALJ gave this opinion little weight, concluding that it was inconsistent with Dr. Diehl's earlier findings and not supported by objective medical evidence. (*Id.* at 19.) The ALJ's conclusion in this regard is supported by substantial evidence.

Last, the ALJ also correctly pointed to the opinion of Dr. Perry Caviness, a non-examining consulting physician, who also completed a PRFCA as to Plaintiff and noted that she (1) could occasionally lift twenty pounds, (2) could frequently lift ten pounds, (3) could stand or walk about six hours per workday, (4) could sit about six hours per workday, (5) could push or pull without any additional limitations, (6) had no postural, manipulative, visual, communication, or environmental limitations. (*Id.* at 461-64.) Dr. Caviness concluded that Plaintiff was capable of performing light physical work. (*Id.* at 467.)

In sum, substantial evidence supports the ALJ's credibility determination. Plaintiff disagrees with the ALJ, yet the Court may not make credibility determinations or substitute its

judgment.  *See Chater*, 76 F.3d at 589.  Simply because the ALJ did not find Plaintiff fully credible does not suggest error.

### C. The ALJ Did Not Err in Determining Plaintiff Could Perform a Significant Number of Sedentary Jobs in the National Economy.

Plaintiff contends that the ALJ erred in concluding that she could perform jobs such as a dial marker and inspector because the findings were not based on substantial evidence of (1) Plaintiff's mental impairment and (2) Plaintiff's limitations in the frequent use of her hands and fingers.  (Docket Entry 7 at 11.)  Plaintiff has essentially reasserted those arguments set forth above.  The undersigned has addressed these issues above and will not repeat that analysis.

Plaintiff also asserts that the ALJ erred in disregarding the opinion of the VE without explanation.  (*Id.* at 12.)  The ALJ posed three hypotheticals to the VE.  The first hypothetical asked the VE to presume (1) sedentary work, (2) occasional climbing, balancing, stooping, kneeling, crouching, and crawling, (3) occasional overhead reaching (dominant hand) and frequent handling and fingering bilaterally, and (4) mild limitations on attention, concentration, understanding, and memory.  (*Id.* at 53.)  The VE concluded that an individual with these limitations could perform a job as a dial marker.  (*Id.* at 54.)  The second hypothetical asked the VE to consider additional postural and manipulative limitations (no climbing, balancing, stooping, kneeling, crouching, and crawling but "occasional bi-level reaching in all directions, occasional handling and fingering bilaterally").  (*Id.*)  The VE stated that Plaintiff would not be able to perform the job of dial marker with such limitations, but could perform work as a matrix inspector.  (*Id.*)  The ALJ's third hypothetical added a final

25

limitation ("four to six unscheduled 15-minute breaks each day to recover from pain" "in addition to the regular breaks"). (*Id.* at 54-55.) The VE concluded that there would be no work available to Plaintiff if she were subject to this additional limitation. (*Id.*) The ALJ ultimately concluded that "[c]onsidering [Plaintiff's] age, education, work experience, and residual functional capacity, there [were] jobs that exist in significant numbers in the national economy that [she] can perform" such as inspector and dial marker. (*Id.* at 20.)

Plaintiff seems to fault the ALJ for not explaining why he did not adopt all of the limitations posed in the ALJ's hypotheticals and the VE's responses, including those limitations that were not ultimately adopted in the RFC. Case law suggests no such obligation. *See e.g.*, *Johnson v. Commissioner of Social Sec.*, 398 F. App'x 727, 735 (3rd Cir. 2010) (concluding that ALJ's failure to explain why he did not consider VE's answer to second hypothetical question, which included work restriction of frequent breaks, did not render his finding deficient because it was obvious the answer was immaterial once the ALJ made RFC determination, which did not include need for frequent breaks); *Boynton v. Apfel*, No. 98-1987, 1999 WL 38091, *4 (7th Cir. Jan. 7, 1999) (unpublished) (concluding that ALJ did not need to explicitly address second hypothetical because his findings implicitly rejected the basis for that question). Accordingly, this argument is without merit.

**D. Remand to Consider Additional Evidence Is Not Warranted.**

Finally, Plaintiff contends that remand is proper so that the ALJ may consider additional evidence of mental health treatment that Plaintiff received subsequent to the hearing (August 13, 2008) and the date of the ALJ's decision (November 10, 2008) but before

26

the denial of the Appeals Council (February 23, 2010). (Docket Entry 7 at 13.) The Fourth Circuit has concluded that a court may remand a case to the Commissioner on the basis of new evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time the application was first filed; (2) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her; (3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant must make at least a general showing of the nature of the new evidence to the reviewing court. *Miller v. Barnhart*, 64 Fed. App'x 858, 859-60 (4th Cir. 2003); 42 U.S.C. 405(g). The Fourth Circuit has elsewhere concluded that the additional evidence must relate to the period on or before the date of the ALJ's decision. *Wilkins v. Secretary, Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991) (en banc).

Remand is not warranted. Even if Plaintiff satisfied the remaining elements of the test, Plaintiff has not provided good cause excusing her failure to submit the evidence to the Commissioner. Counsel asserts that while this matter was before the Appeals Council:

> counsel requested records from NorthEast Psychiatric and Psychological Services on July 11, 2009, together with a check for the records . . . . No records were received in response to this request. Counsel is not aware of the reason that the records were not sent by NorthEast Psychiatric in response to the request, but they were [n]either sent by the doctor nor received by counsel. After the Appeals Council decision was received, the records were requested again on March 10, 2010, along with another check. The records were received on March 15, 2010.

(Docket Entry 7 at 14.) Counsel does not explain why it took more than six months to realize

27

that the request for records remained unsatisfied, during which time Plaintiff's claim was evaluated by the Appeals Counsel without the benefit of these records. Counsel's efforts to establish good cause falls short of the type of good cause the Fourth Circuit has found compelling in other cases. *See, e.g., Phillips v. Apfel*, No. 98-1221, 1999 WL 104608, *1-2 (4th Cir. 1999) (unpublished) (concluding that good cause was present where claimant with low IQ was unable to submit records containing information regarding childhood IQ tests earlier because he used a different name in school, and this raised some difficulty in recovering them).

## VI. CONCLUSION

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (Docket Entry 6) be **DENIED**, Defendant's Motion for Judgment on the Pleadings (Docket Entry 11) be **GRANTED** and the final decision of the Commissioner be upheld.

_____
Joe L. Webster
United States Magistrate Judge

Durham, North Carolina
April 8, 2013

28